# Richmond.

## SHIFLETT v. COMMONWEALTH.

### November 19, 1925.

1. HOMICIDE—*Murder or Manslaughter—Premeditation—Instructions—Case at Bar.*—In the instant case accused was convicted of murder in the first degree. After a fight between accused and deceased, deceased ran up the road a distance between sixty and one hundred yards and accused pursued him, and when within five or six steps of him hit him with a rock, from the effects of which he died. It was apparent from the evidence and instructions that accused chiefly relied upon self-defense. The jury were repeatedly told that if the accused apprehended that he was in danger of death or serious bodily harm at the time of the homicide, they must acquit him. On the other hand, the jury were instructed, at the request of the Commonwealth, "to constitute murder in the first degree, with reference to this case, there must be a premeditated or previously formed design to kill, but it is not necessary that this premeditated design to kill should have existed for any particular length of time. It is only necessary that it should be a course determinately fixed on, before the act done, and not brought about by provocation at the time of the act, or so recently before as not to give time for reflection; neither is it necessary to prove this formed design by positive evidence. If the prisoner, as he approached the deceased, and at the distance of about ninety yards from him, or nearer, then formed the design and came to the determination to kill the deceased, and in pursuance of this design ran or trotted the said distance of ninety yards and killed deceased, without any provocation then received, it was murder in the first degree."

   *Held:* That the giving of this instruction for the Commonwealth did not constitute error.

2. APPEAL AND ERROR—*Assignment of Error—Verdict and Judgment Contrary to the Evidence—Case Treated as on Demurrer to the Evidence.*—On an assignment of error that the judgment and verdict of guilty in a prosecution for murder were contrary to the law and the evidence, the defendant stands in the Supreme Court of Appeals practically as on a demurrer to the evidence. Every presumption is in favor of the verdict, and no inferences in his favor can be drawn from the evidence in his behalf except those that necessarily flow therefrom. On the other hand, every inference in favor of the verdict that the

Syllabus.

jury might have fairly drawn, as well from the evidence on his behalf as that on behalf of the Commonwealth, must be drawn.

3. HOMICIDE—*Questions of Law and Fact—Conflict in the Testimony—Case at Bar.*—In the instant case, a prosecution for homicide, there was some conflict in the testimony as to whether accused threw a bottle at the deceased before or after deceased started towards him with an open knife and also as to whether or not deceased threw a stone at the accused about the time he was overtaken by accused in the road.

*Held:* That these were questions for the jury which were determined by the verdict.

4. HOMICIDE—*Murder—Evidence to Support Verdict of Guilty—Case at Bar.*—In the instant case, a prosecution for homicide, a fight arose between deceased and accused, in which deceased cut accused and accused threw deceased and beat him. Deceased got up and went out of the yard, where the fight occurred, into the public road and ran rapidly up the road. Accused followed him for sixty to one hundred yards, and when within five or six steps of him hit him with a rock, from the effect of which blow he died. There was no conflict about the fact that deceased had abandoned the fight and was rapidly leaving the scene at the time the fatal blow was struck.

There was some conflict as to whether deceased threw a stone at accused about the time he was overtaken in the road and whether, when deceased fell from the blow of the rock, accused jumped on him. Several witnesses testified that accused was in a violent rage at the time of the infliction of the mortal wound and shortly thereafter, but there was other testimony tending to show that accused's reason was not dethroned and that he was responsible for his acts.

*Held:* That it could not be said that a verdict of guilty of murder in the first degree was contrary to the law and the evidence or without evidence to support it.

5. HOMICIDE—*Murder in the First and Second Degree—Instruction—Case at Bar.*—In the instant case, a prosecution for homicide, where the evidence showed a fight between accused and deceased, the retreat of deceased for about sixty to one hundred yards, pursued by accused who, upon coming close to him, struck him with a rock, from the effects of which blow deceased died, the trial court committed no error in instructing the jury on the law of murder in the first or second degree.

6. APPEAL AND ERROR—*Invited Error—Instruction—Case at Bar.*—A party cannot complain of error which he has invited, therefore, accused, in a prosecution for homicide, cannot complain that the court instructed the jury on the law of murder in the first or second degree, when the accused asked and was granted an instruction on the same subject.

7. HOMICIDE—*Manslaughter—Self-Defense—Burden of Proof—Instructions.*—
In a prosecution for homicide the court instructed the jury "that
where death ensues on a sudden provocation, or sudden quarrel
without malice prepense, the killing is manslaughter, and in order
to reduce the offense to killing in self-defense, the jury must believe
beyond a reasonable doubt that he did not kill the deceased through
the necessity of preserving his own life, or that there was no reason-
able ground to believe that the killing was necessary to preserve
his own life, or to save himself from great bodily harm." This
instruction correctly defined voluntary manslaughter, but is con-
fessedly wrong as to the burden placed upon the accused as to self-
defense. The error, however, could not possibly have injured the
accused, as no question of self-defense was involved in the instant
case.

8. HOMICIDE—*Self-Defense—Manslaughter—Case at Bar.*—In the instant
case, a prosecution for homicide, deceased had abandoned the fight
and gone up the road, and the accused pursued him and, at a time
when he was in no danger, actual or threatened, inflicted the mortal
blow. If, as the accused claims, the deceased then picked up a
rock and threw it at him, the most the accused could claim for
himself was a case of voluntary manslaughter.

9. APPEAL AND ERROR—*Instructions—Prejudice to Accused.*—An erroneous
instruction which could not have possibly injured the accused is,
at most, harmless error.

10. HOMICIDE—*Self-Defense—Manslaughter—Case at Bar.*—In the instant
case, a prosecution for homicide, the accused asked for an instruc-
tion to the effect that his right of self-defense in his first fight with
deceased extended to a second fight with deceased, which took place
immediately or shortly after. Deceased had abandoned the fight
and gone off, and if the accused had ground of self-defense in the
first fight, in a yard, that could not attach to a separate and distinct
altercation in the road where the accused appeared to be the aggres-
sor. If deceased threw a rock it was because he found himself
pursued, but whether he threw it or not, the evidence presented no
case of self-defense. The only question was whether or not the
offense of accused was reduced to manslaughter.

*Held:* That the court committed no error in refusing the instruction.

Error to a judgment of the Circuit Court of Albe-
marle county.

*Affirmed.*

The opinion states the case. .

*Walker & Timberlake* and *Chas. A. Hammer*, for the plaintiff in error.

*John R. Saunders, Attorney-General; Leon M. Bazile and Lewis H. Machen, Assistant Attorney-Generals,* for the Commonwealth.

PRENTIS, P., delivered the opinion of the court.

The facts and the questions presented by the record are sufficiently stated and discussed in the dissenting opinion. We are in accord, except as to instruction No. 8, given for the Commonwealth, but as to this a majority of the court are of the opinion that the giving of this instruction does not constitute error.

[1] The crucial question, as it seems to us, is not whether the instruction took away from the jury the right to pass on the question of manslaughter, but whether or not it so invaded the province of the jury as to deny to the accused his right to have them determine whether he had supported his plea that he had killed the deceased in self-defense, or that he had killed him wilfully, deliberately and with premeditation. We do not think it should be construed as directing the jury not to find the accused guilty of manslaughter or to deny him any other legal right.

It is impossible to read the evidence and the nine instructions given for the accused without seeing that he chiefly relied upon self-defense. The jury were told with unnecessary repetition that if the accused apprehended that he was in danger of death or serious bodily harm at the time of the homicide, they must acquit

him, and instruction "C" given for the accused presents concretely the defense relied on by the accused for his acquittal. This instruction No. 8, on the other hand, fairly construed with reference to the evidence, merely presents the contrary view of the prosecution. In terms it cautioned the jury that in order to convict of murder in the first degree there must be "a premediated or previously formed design to kill;" that "it should be a course determinately fixed on before the act done, and not brought about by provocation at the time of the act, or so recently before as not to give time for reflection;" that only if the accused "as he approached the deceased, and at the distance of about ninety yards from him, or nearer, then formed the design and came to the determination to kill the deceased and, in pursuance of this design, ran or trotted the said distance of ninety yards and killed the deceased, without any provocation then received, it was murder in the first degree."

It seems to us apparent that, assuming all of the statements in the instruction to be true (and there was evidence to support each of these statements), this crime was a wilful, deliberate and premeditated killing. Its precise form was doubtless suggested by the precise nature of the defense and the form of the instructions given for the defense.

Suppose a case in which the evidence for the prosecution showed an intentional killing by poison administered by the accused to the deceased, and the defense interposed to be that the administration was inadvertent; could it fairly be said that it would be error for the court to instruct that if the jury believed that it was administered with murderous intent, they must find the accused guilty of murder in the first degree? Surely not, it must be conceded. It is equally

apparent, we think, that in this instruction the jury were clearly cautioned that before they could convict the accused of murder in the first degree they must find from the evidence every fact necessary to constitute that crime.   Whatever fair criticism may be made of its form, we think that it is an accurate statement of the law applicable to the issues raised by the evidence, and that the jury could not possible have misunderstood that the issues of fact so raised were submitted to them for determination.   It cannot be error, we think, in a case in which the evidence will support a verdict of murder in the first degree, to tell the jury that if they are convinced of its truth they may so find.

The judgment will, therefore, be affirmed.

*Affirmed.*

BURKS, J., dissenting:

Linwood Shiflett and Monroe Morris were jointly indicted for the murder of Henry Shiflett.   Linwood elected to be tried separately.   There were two trials. At the first trial the jury failed to agree and were discharged.   At the second trial the jury found him guilty of murder of the first degree and fixed his punishment at twenty years in the penitentiary.   Several exceptions were taken during the trial, and a writ of error was awarded by one of the judges of this court.

[2] The first error assigned is that the verdict and judgment are contrary to the law and the evidence. On this assignment he stands in this court practically as on a demurrer to the evidence.   Every presumption is in favor of the verdict, and no inferences in his favor can be drawn from the evidence in his behalf except those that necessarily flow therefrom.   On the other hand, every inference in favor of the verdict that the

jury might have fairly drawn, as well from the evidence on his behalf as that on behalf of the Commonwealth, must be drawn.

Viewing the evidence in this light, the jury might have found the following as facts:  That the deceased and the accused had been on friendly terms and came together in the truck of the accused, on the day of the homicide, to the house of Bryan Shiflett; that while there they went to the spring near the house and each of them took one or more drinks of whiskey out of a bottle provided by the accused; that after doing so the accused hid his bottle in some weeds near the spring; that, later, the accused looked for the bottle but could not find it, and asked his wife about it, and she said the deceased had it; that the wife asked the deceased for it and he denied having it and offered her a half pint bottle; that the wife insisted that he had the bottle, and deceased became angry because of the accusation; that about that time the accused came up and the deceased produced the bottle and handed it to the wife, and said "anybody that says that I stole this liquor is a damn liar;"  that the wife handed the bottle to the accused; that the accused said "nobody gave it to you and you have got it; what do you call it;" that the deceased said he would kill anyone who said he stole the whiskey; that the accused threw the bottle at the deceased but missed him, and they made for each other, the deceased having an open knife in his hand and cutting at the accused as they came together; that the accused threw the deceased down on the ground and was beating him about the face and head until he was pulled off by Bryan Shiflett, father-in-law of the accused; that during the fight the deceased inflicted slight wounds with his knife on the neck and head of the accused; that while the deceased was down

the knife was gotten out of his hand by the wife and mother-in-law of the accused; that while the deceased was still down and before he had recovered from the blows inflicted by the accused, Monroe Morris kicked him about the head and face; that as soon as the deceased got up, he went out of the yard where the fight occurred into the public road and went rapidly up the road; that meanwhile the accused tried to get possession of an axe that was near by, but was prevented from doing so; that after the deceased had left the yard and had gotten out into the public road and was going up the same, Monroe Morris said several times: "Let's kill him," "Let's kill him," and he and the accused ran up the road a distance estimated by different witnesses from sixty to 100 yards, and when within five or six steps of the deceased the accused threw a rock at the deceased and hit him on the head, from the effects of which he died the next day. When the deceased was struck with the rock, the accused jumped on him and beat him violently with his fists, and continued to beat him until he was pulled off by Bryant Shiflett.

[3] There was some conflict in the testimony as to whether the accused threw the bottle at the deceased before or after the deceased started towards him with an open knife, and also as to whether or not the deceased threw a stone at the accused about the time he was overtaken in the road, but these were jury questions with which we are not concerned. There was no conflict about the fact that the deceased had abandoned the fight and was rapidly leaving the scene at the time the fatal blow was struck, and that after the mortal wound had been given and friends were preparing to take the deceased to the hospital, the accused strenuously objected to his being taken.

When the deceased fell from the blow with the rock, the accused admits that he jumped on him, and he was so badly beaten and bruised that a familiar friend did not recognize him. While in this condition, and when Bryant Shiflett and his wife were binding up his wounds and endeavoring to staunch the flowing blood, the accused was standing by and gives the following account of what took place: "I was looking at the place standing there, and Henry said to me: 'Linwood, I am not mad with you; come here and take my hand;' I said: 'What did you cut me for?' He said: 'I did not cut you.' I said: 'Yes, you did cut me.' Mose Via and Warren Davis and Carey Hawley were standing there. There was a piece of stake, or something sticking in the fence crack, just on the opposite side there. Mose Via and Carey Hawley don't like me very well. I taken hold of that piece of stake. He said again he was not mad with me, as if he was mad with somebody else. Said he did not cut me. I said: 'If you say you did not cut me I will kill you,' or something like that. My wife told me not to say no more and to put the stake down and I put it down."

Speaking of the situation at this time, the witness Davis testified as follows: "When I looked up Bryant was holding Linwood Shiflett and Morris, and Linwood had a rock in his hand trying to hit Henry. Bryant was holding the two men, and Linwood said: 'Yes, God damn you, you cut me.' Henry said: 'Linwood, I never cut you.' Linwood said: 'You God damn bloody son-of-a-bitch, if you say you did not cut me I will finish you right here.' "

Several witnesses testified that the accused was in a violent rage at the time of the infliction of the mortal wound and shortly thereafter, but there was other testimony tending to show that his reason was not

dethroned, and that he was responsible for his acts. Davis, a witness for the Commonwealth, testified that the accused was very mad, but "I would not say he was excited. I have been mad many times and not excited." The accused himself testified on both trials and on the last trial his testimony on the subject of his mental condition and what he had said about it on the first trial was as follows:

"Q. You were mad, you say?

"A. Sure, I was mad.

"Q. Did you have your judgment about you?

"A. I might have had. So many different ways of having judgment.

"Q. You were mad as 'Old Nick?'

"A. I don't know how mad, but pretty mad.

"Q. In a towering rage?

"A. Not in a towering rage. Whenever I get mad I generally use some judgment.

"Q. Is that what you said?

"A. I think I said something like that. I did not really mean that I was not mad enough to do anything. A man don't have to get in a towering rage that he has "not got some sense about him. If I had been I would not have let him hit me with another rock.

"Q. Then you had your judgment about you when you went up the road—you were mad, but you kept cool?

"A. No, not cool.

"Q. But you had your judgment?

"A. Yes, sir; I did not say anything about judgment when I went up the road.

"Q. Did you have your judgment about you?

"A. I was mad, and he hit me with a rock, and if I had let him hit me with the other one and knocked me down I don't know what would have happened.

"Q. Did you have your judgment about you?

"A. Well, in a way. I was mad and excited, having been cut up, and, of course, it was using some judgment, I think, to keep him from hitting me with that other rock and not let him get up.

"Q. Using some judgment to knock him down and beat him?

"A. I have known of men being knocked down and then get up and cut a man.

"Q. Were you using your judgment when you told him after he wanted to shake hands that if he denied cutting you, you were going to finish him; was that using judgment?

"A. I don't know; I was mad with him. If he had got well he would have to have done a lot of apologies to me before I would ever shake hands with him after he cut me like he did."

[4] Under the rules controlling this court in reviewing the findings of fact by a jury, we are unable to say that the verdict of the jury is contrary to the law and the evidence, or without evidence to support it.

[5, 6] In view of the evidence hereinbefore stated, the trial court committed no error in instructing the jury on the law of murder of the first or second degree. Furthermore, the accused asked and was granted instructions on the same subject. It is well settled that a party cannot complain of error which he has invited. *Levy* v. *Davis*, 115 Va. 814, 820, 80 S. E. 791, and cases cited.

The granting of instruction 8 at the instance of the Commonwealth is assigned as error. That instruction was as follows:

"The jury are instructed that, to constitute murder in the first degree with reference to this case, there must be a premeditated or previously formed design to kill, but it is not necessary that this premeditated design to kill should have existed for any particular length of

time. It is only necessary that it should be a course determinately fixed on, before the act done, and not brought about by provocation at the time of the act, or so recently before as not to give time for reflection; neither is it necessary to prove this formed design by positive evidence. If the prisoner, as he approached the deceased, and at the distance of about ninety yards from him, or nearer, then formed the design and came to the determination to kill the deceased and, in pursuance of this design, ran or trotted the said distance of ninety yards and killed the deceased, without any provocation then received, it was murder in the first degree."

Complaint is made of the last sentence only. All instructions should have due relation to the evidence before the jury, as the law of the case is to be determined by the facts. If the facts are in dispute, the instruction should contain a fair statement of the evidence. It is necessary, therefore, to state more fully than has been done the evidence on the point covered by the instruction. In addition to what has been stated, it appears from the testimony for the Commonwealth that at the time of the fatal blow and for some time thereafter, the accused was "very mad," "violently angry," and acted like he was wild, "like he was crazy." The time which elapsed between the fight in the yard and the fatal blow in the road was very brief. The deceased "jumped up and ran out into the road," and was overtaken by the accused when he had proceeded about ninety yards. Bryant Shiflett, witness for the Commonwealth, described the two occurrences as practically one continuous transaction. The fight in the yard had been a "sudden affray" between former friends. The accused had received serious provocation which had made him very angry, and it was error in

the trial court to tell the jury that the act of the accused was murder of the first degree, if the killing was "without any provocation *then received.*" Whether there was a conjunction of passion and provocation, or the killing was wilful, deliberate and premeditated, with malice aforethought, should have been left to the jury with proper instructions from the court. Under the circumstances given, if the jury believed that the deceased did not throw a rock at the accused, as claimed by the latter, *immediately before the fatal blow was struck,* the jury could have found no other verdict than one of first degree murder. All the attorney for the Commonwealth had to do to insure a conviction for murder of the first degree was to harp upon this instruction and that no rock was thrown by the deceased in the road.

That the instruction was erroneous I have no doubt. It only remains to inquire what is the effect of that error.

In *Jackson* v. *Commonwealth,* 97 Va. 762, 33 S. E. 547, the facts of the case are not given, but the court deals with the instructions, which present a case remarkably similar to the instant case. In the course of the opinion it is said by Judge Keith, speaking for the court: "In the tenth instruction, in order to reduce the offense below the degree of murder, the prisoner was required to prove circumstances, which would have entitled the prisoner to a verdict of acquittal; thus informing the jury that they could not find the prisoner guilty of manslaughter without proof of facts and circumstances sufficient to relieve him of all responsibility for the crime with which he was charged. It thus appears that the general proposition correctly stated in the third instruction is inconsistent with, and is indeed contradicted by, the more specific statement of the law presented in the instruction under consideration.

"Having reached the conclusion that the tenth instruction is erroneous, it only remains to be considered whether or not it was prejudicial to the prisoner.

"It has been said by this court that all error is presumed to be prejudicial, and while it has approved verdicts rendered upon erroneous instructions, it does so with great caution, and *only where it clearly appears that no injury could have resulted from the error.* A lawyer reading the instructions in this case could scarcely be misled by them, but instructions are given to jurors because they are not lawyers. They are given to aid the jury in reaching a right conclusion, and not in order to exercise their skill in reconciling contradictory propositions." (Italics supplied.)

In *Montgomery v. Commonwealth,* 98 Va. 852, 860, 37 S. E. 1, 3, the last paragraph above from the *Jackson Case* is quoted with approval. It is again quoted with approval in *Richmond, etc., Co. v. Allen,* 101 Va. 200, 206, 43 S. E. 356, 358. It is also quoted with approval in *State v. Johnson,* 49 W. Va. 684, 693, 39 S. E. 665, 669, and is cited with approval in *Foley v. City of Huntington,* 51 W. Va. 402, 41 S. E. 115.

In Burks' Pleading & Practice (2d. ed. by Morrissett) it is said: "Instructions must be read in the light of the evidence applicable to the issues joined. When given, they are instructions of the court, no matter by whom asked, and must be read as a whole, and a defect in one may be corrected by a correct statement of the law in another, if the court can see that (when read and considered together) the jury could not have been misled by the defective instruction. All error, therefore, is presumed to have affected the verdict unless the contrary plainly appears. But if it can be seen from the whole record that, even under proper instructions, a different verdict could not have been rightly found, the verdict will not be set aside."

The statement of the text is supported by numerous Virginia cases, which need not be here cited. These authorities abundantly support the proposition that where error has been committed in an instruction, the verdict must be set aside unless it *clearly appears that no injury could have resulted from the error.*

In *Richardson* v. *Commonwealth*, 128 Va. 695, 696, 104 S. E. 788, 790, it is said: "It has long been settled that where a homicide is committed in the course of a sudden quarrel or mutual combat, or upon sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation, it is not murder but is manslaughter only—voluntary manslaughter if there be no further justification, and involuntary manslaughter if the killing be done in the commission of some wilful act such as in justifiable self-defense."

In *Brown* v. *Commonwealth*, 138 Va. 807, 122 S. E. 421, it was held: "It is only where the killing is 'without any or upon very slight provocation that malice may be inferred from the mere fact of killing, and that the slayer may be found guilty of murder.' That is to say, in such case, as in others, malice, and hence 'murder,' is presumed from the fact of killing unaccompanied by circumstances of extenuation; but, where there is provocation which is more than 'very slight,' such presumption does not arise."

In *Mealy* v. *Commonwealth*, 135 Va. 585, 592, 115 S. E. 528, 530, it is said that "the nature and extent of a defendant's provocation and the effect which it had upon her was a question for the jury. If her account be altogether true, she did have great provocation, but there was room for the jury to doubt the entire accuracy and truthfulness of her testimony."

In the face of the authorities and in view of the testimony in this case, it could not be doubted that instruction 8 was highly prejudicial to the accused. It seems equally plain that whether the killing was from the sudden heat of blood without malice, or was a wilful, deliberate and premeditated killing with malice aforethought, was a question for the jury. The jury should have been left free to pass upon all the evidence relating to the killing and determine from that the degree of the offense. The trial court erred in requiring that fresh provocation should have been received by the accused while he "ran or trotted the said distance of ninety yards." If the provocation received in the yard was adequate and there had not been sufficient cooling time, and the killing was without malice, then it was not murder. These were questions, however, which should have been submitted to the jury, but which the instruction took away from them. It does not clearly appear that no injury could have resulted from the error, and it is only in such cases that the verdict can be allowed to stand. If the accused may have been injured by the instruction, it is the duty of this court to set aside the verdict. We are not to inquire whether or not he was in fact prejudiced, but whether he may have been; and it is only where it plainly appears that he could not have been so injured that the verdict can be permitted to stand.

Numerous other instructions were given by the court, all of which, except those copied in this opinion, are given in the margin.* They covered nearly every

---

* "1. Murder is distinguished by the law of Virginia as murder in the first degree and murder in the second degree.

"2. The jury are instructed that any wilful, deliberate, and premeditated killing is murder in the first degree.

"3. Every homicide in Virginia is presumed in law to be murder in the second degree. In order to elevate the offense to murder in the first degree, the burden of proof is on the Commonwealth, and to reduce the offense to manslaughter, the burden of proof is on the prisoner.

feature of the case, but none of them cured the error ·committed in instruction No. 8. The vice of instruction No. 8 is emphasized by the language of instruction No. 5: "To constitute a wilful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any particular length of time prior to the actual killing. It is only necessary that such intention should come into existence for the first time at the time of such killing or any time previously." This is a correct statement of the law, but when read in connection with instruction 8, it plainly told the jury that the case was one of murder of the first degree, unless fresh provocation was given, and took away from the jury the consideration of the other provocation just previously received, and of the mental condition of the accused engendered thereby. These were proper matters for the consideration of the jury and should not have been taken away from them.

"4.   To constitute murder in the first degree the prisoner must have been incited to the killing by malice, and the killing must have been a wilful, deliberate, and premeditated act on the part of the prisoner; that is to say, he must have wiled, deliberated and premeditated that he should kill the deceased or do some serious bodily injury, the necessary result of which would be his death, and from which he died.

"5.   To constitute murder in the first degree, the prisoner must have been incited to the killing by malice and the killing must have been wilful, deliberate, and premeditated act on the part of the prisoner; that is to say, he must have wiled, deliberated and premeditated that he should kill the deceased or do him some serious bodily injury, the necessary results of which would be his death, and from which he died; and to constitute a wilful, deliberate and premeditated killing, it is not necessary that the intent to kill should exist for any particular length of time prior to the actual killing. It is only necessary that such intention should come into existence for the first time at the time of such killing or any time previously.

"6.   If the jury believe from the evidence that Linwood Shiflett killed Henry Shiflett in the manner charged in the indictment (wilfully, deliberately, and premeditatedly), then they will find him guilty of murder in the first degree.

"7½.   The court instructs the jury that if they believe from the evidence that Henry Shiflett retreated in good faith, and that Linwood Shiflett, the accused, had no reasonable grounds for apprehending further danger from him, the pursuit of the said Linwood Shiflett after the said Henry Shiflett is not justifiable, and if under such circumstances the said Linwood Shiflett pursued and killed the said Henry Shiflett, the killing cannot be justified on the grounds of self defense, unless they believe that Henry Shiflett renewed the assault.

Instruction No. 8 undertook to deal with the concrete facts of the instant case and declared the case to be one of murder of the first degree if no fresh provocation had been given, while, but for the instruction, the jury might have found it to be one of voluntary manslaughter.

An incomplete statement of the case in one instruction may be supplemented by a fuller or additional statement in other instructions, but it is rare, if ever, that an error committed in one instruction will be cured by a correct statement of the law in another instruction.

In *American Locomotive Co. v. Whitlock*, 109 .Va.. 238, 63 S. E. 991, it was ·held: "A material error in an. instruction complete in itself, is not cured by a correct· statement of the law in another instruction. The two· being in conflict, the verdict of the jury will be set· aside, as it cannot be told by which instruction the·

"9.  The court instructs the jury that the jury room is no place for pride of opinion or obstinacy, but that it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor with each other, and with open minds, to give careful consideration to the views of their fellows, and, if it can be done without a sacrifice of conscientious convictions, agree· upon a verdict.  By such means and such only, in a body where unanimity is required, can safe and just results be attained and without them trial by jury, instead of being an essential aid in the administration of justice, would be a most effective obstacle to it.

"10.  The court instructs the jury that the necessity relied upon to· justify the killing of Henry Shiflett by Linwood Shiflett must not arise out of the prisoner's misconduct.

"(A).  The court instructs the jury that the law presumes the accused to be innocent until he is proven guilty beyond a reasonable doubt, and if there is upon the minds of the jury after, weighing and considering all the· evidence on both sides, any reasonable doubt of the guilt of the accused, he is entitled as a matter of absolute right under the law to an acquittal, and the court tells the jury that mere suspicion or probability of his guilt, however strong, is not sufficient to convict, nor is it sufficient if the greater weight or preponderance of evidence supports the charge in the indictment. To warrant his conviction, his guilt must be proved so clearly and conclusively and the evidence thereof must be so strong, as to exclude every reasonable hypothesis of his innocence.

"(B).  The court instructs the jury that the law presumes every person charged with crime to be innocent until his guilt is established by the Commonwealth beyond a reasonable doubt, and this presumption goes with the· accused through the entire case, and applies at every stage thereof; and if,

jury was controlled." To the same effect see *Powhatan Lime Co.* v. *Affleck's Adm'r*, 115 Va. 643, 79 S. E. 1054; *Southern R. Co.* v. *Snow*, 117 Va. 627, 85 S. E. 488; *Va. & S. W. Ry. Co.* v. *Skinner*, 117 Va. 851, 86 S. E. 131.

Instruction 6, given for the accused, did not deal with the distinction between murder and manslaughter, but stated a hypothetical case based upon the evidence, which, if found to be true, the court said entitled the accused to an acquittal. This was the exact state of the instruction condemned in the *Jackson Case*, *supra*.

Instruction J, given for the accused, simply defined the different degrees of homicide, and could not and did not cure the error of instruction 8.

I am of opinion that for the error in instruction 8, the judgment of the trial court should be reversed.

Courts are loath to reverse a case for any error com-

after having heard all the evidence in the case, the jury have a reasonable doubt of the guilt of the accused upon the whole case, or as to any fact essential to prove the charge made against him in the indictment, it is their duty to give the prisoner the benefit of the doubt, and find him not guilty.

"(C). The court instructs the jury that if they believe from the evidence in this case that the difficulty or fight between the accused and the deceased in the yard at Bryant Shiflett's house was brought on by the fault of the deceased, and that the deceased made an unjustifiable attack upon the accused and cut him with a knife; that the second difficulty between the deceased and the accused in the road occured shortly after the difficulty or fight in the yard and while the accused was still smarting from the wounds inflicted upon him by the deceased and before sufficient time had elapsed for him to cool off from the passion aroused by the assault made upon him by the deceased; and that the difficulty or fight in the road was begun by the deceased picking up two stones and throwing one of them at the accused and advancing toward him in a threatening manner with the other in his hand; and that in the course of this difficulty in the road the accused, under the reasonable apprehension that he was in danger of death or serious bodily harm at the hands of the deceased, inflicted upon the deceased the wound which caused his death, then the jury should find him not guilty.

"(D). The court instructs the jury that if they believe from the evidence that the defendant killed Henry Shiflett under the reasonable apprehension that his own life was in imminent and immediate danger, or that he was in imminent and immediate danger of serious bodily injury, he was justified in so doing, though such danger was not real. That the question for the jury in this case is not whether the taking of the life of the deceased might have been safely avoided, but whether the defendant, under the

mitted during the trial when there has been a fair trial on the merits and substantial justice has been reached; but there has been no fair trial where there has been substantial error in the instructions given to the jury. Important as it is to have a prompt enforcement of the criminal laws of the State and to extend the doctrine of harmless error as far as it may be safely done, I am unwilling to jeopardize the liberty of the innocent in order to insure the conviction of the guilty.

The giving of instruction No. 7 for the Commonwealth is also assigned as error.

[7, 8] That instruction is as follows:    "The court instructs the jury that where death ensues on a sudden provocation, or sudden quarrel, without malice prepense, the killing is manslaughter, and in order to reduce the offense to killing in self-defense, the jury must believe beyond a reasonable doubt that he did not kill the deceased through the necessity of preserv-

circumstances in which he was placed, might reasonably have believed it necessary to use the defensive action which resulted in the death of the deceased, either to save his own life, or to avoid serious bodily harm to himself.

"(F).    The court instructs the jury that a man when threatened with danger must determine from appearances and the actual state of things surrounding him as to the necessity of self-defense; and if he acts from reasonable and honest convictions, he will not be held responsible criminally for a mistake as to the extent of the actual danger where other and reasonable men might have been alike mistaken.

"(G).    The court further instructs the jury that if they shall believe from the evidence that the accused, under the circumstances stated in other instructions, killed Henry Shiflett under an honest and reasonable apprehension that his own life was in imminent and immediate danger, or that he was in imminent and immediate danger of serious bodily injury, he was justified in so doing, though such danger was not in fact real; the question for the jury in this case is not whether the taking of the life of the deceased might have been safely avoided, but whether the defendant, under the circumstances in which he was placed, might reasonably have believed it necessary to use the defensive action which resulted in the death of the deceased, either to save his own life or to avoid serious bodily harm to himself.

"(H).    The court instructs the jury that if they believe from the evidence that the accused knew that the deceased was a dangerous man, then the jury are instructed that they must consider the fact along with the other facts and circumstances in declaring whether or not the accused had reasonable cause to believe that he was in imminent danger of death or

ing his own life, or that there was no reasonable ground to believe that the killing was necessary to preserve his own life, or to save himself from great bodily harm.''

This instruction ' correctly defined voluntary manslaughter, but is confessedly wrong as to the burden placed upon the accused as to self-defense. The error, however, could not possibly have injured the accused. No question of self-defense was involved. According to his own statement the deceased had abandoned the fight and gone up the road, and the accused pursued him, at a time when the accused was in no danger, actual or threatened, and inflicted the mortal blow. If, as the accused claims, the deceased then picked up a rock and threw it at him, the most the accused could claim for himself was a case of voluntary manslaughter.

[9] No authority is needed for the proposition that an erroneous instruction which could not possibly have injured the accused is, at most, harmless error.

[10] The refusal of the trial court to give instruction

---

serious bodily harm at the hands of the deceased at the time he threw the rock in the public road and struck and injured the deceased.

"(I). The court instructs the jury that if they believe from the evidence in this case that the accused at the time he inflicted the fatal wound on the deceased was acting in self-defense, as defined in the instructions given in this case, then the accused is entitled to an acquittal and no subsequent language or conduct on his part which did not contribute to the death of the *accused* (deceased) can affect his right to an acquittal, however improper or illegal the jury may consider such language or conduct may have been.

"(J). The court instructs the jury that murder in the first degree is the wilful, deliberate, and premeditated killing of one person by another without any circumstances of extenuation or excuse and with malice aforethought.

"Murder in the second degree is the malicious killing of one person by another, without premeditation or deliberation, but without provocation or upon very slight provocation.

"Voluntary manslaughter is the killing of one person by another in the heat of passion brought about by some action on the part of the deceased which was sufficient to arouse passion in an ordinary man.

"A killing in self-defense is justifiable homicide for which the law does not inflict any punishment."

The numbered instructions were given at the instance of the Commonwealth; those indicated by letters were given at the instance of the accused.

"K," tendered by the accused, is assigned as error. That instruction was as follows:

"The court instructs the jury that if they believe from the evidence in this case that the first difficulty or fight in the yard of Bryant Shiflett's home was brought on by a felonious and unjustifiable attack made by the deceased upon the accused with a knife, and that the second difficulty or fight in the road was also begun by the deceased and took place immediately or shortly after the first, and before sufficient time had elapsed for the passion in the accused by the attack made upon him by the deceased in the yard to cool and subside, then the two fights or difficulties are to be considered and regarded together as part of one and the same fight or difficulty; and the right of self-defense on the part of the accused in the second fight or difficulty was his original right of self-defense as it existed at the time of the difficulty or fight in the yard, and was not affected or impaired by the fact that he followed the deceased into the public road."

The court committed no error in refusing this instruction. The deceased had abandoned the fight and gone off, and if the accused had a ground of self-defense in the altercation in the yard, that could not attach to a separate and distinct altercation in the road where the accused appeared to be the aggressor. If the deceased threw the rock, it is manifest that it was because he found himself pursued by the two men who had just before beaten him so severely in the yard. But whether he threw it or not the evidence presented no case of self-defense. It was simply a question of whether or not the offense of the accused was reduced to manslaughter.

CAMPBELL, J., concurs in dissent.